**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 5 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LLOYD EDWARD MOLLETT,

        Petitioner-Appellee,

v.

MIKE MULLIN, Warden,
Oklahoma State Penitentiary,

        Respondent-Appellant.

No. 01-6403

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-98-539-M)**

---

David M. Brockman, Assistant Attorney General, Criminal Division (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for Respondent-Appellant.

John M. Stuart of Stuart, Frieda & Hammond, P.C., Duncan, Oklahoma, for Petitioner-Appellee.

---

Before **KELLY**, **HENRY**, and **MURPHY**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

Lloyd Edward Mollett was found guilty of first-degree murder and first-degree rape by an Oklahoma jury. At the trial's sentencing stage, the prosecution urged the jury to impose the death penalty. During the jury deliberations that followed, the jury sent the presiding judge a note asking the judge to "tell us if we find a sentence of [l]ife is the[re] any possibility of Mr. Mollett ever leaving prison for any reason whatsoever." The trial judge replied that "[m]atters of parole are beyond the purvue [sic] of the jury or the court to consider." The judge did not advise defense counsel or the prosecution of the question or his response. The jury later sentenced Mr. Mollett to death.

The Oklahoma Court of Criminal Appeals affirmed the convictions and sentences and, later, denied post-conviction relief. Subsequently, the United States District Court for the Western District of Oklahoma conditionally granted Mr. Mollett habeas relief, finding that Mr. Mollett is entitled to a new sentencing hearing on the grounds that (1) the trial court's reply to the jury denied Mr. Mollett due process under Simmons v. South Carolina, 512 U.S. 154 (1994), and (2) Mr. Mollett's trial counsel provided ineffective assistance of counsel during the trial's sentencing phase by failing to investigate and present mitigating evidence. As detailed below, we affirm on the Simmons due process issue and therefore do not reach the issue of ineffective assistance of counsel.

# I. BACKGROUND

This tragic case arises out of Mr. Mollett's rape and murder of Sri Sedjati Sugeng. In 1993, Mr. Mollett and Ms. Sugeng lived in the same apartment complex in Stillwater, Oklahoma. Mr. Mollett lived with his girlfriend and her son; although he suffered from visual impairment, learning disability, and Attention Deficit Disorder, he was able to work at a printing press. Ms. Sugeng lived alone in the apartment complex; she had moved to the United States from Indonesia to attend Oklahoma State University, where she was studying interior design. During this time, Mr. Mollett and Ms. Sugeng became somewhat acquainted. The two owned Rottweiler dogs and would sometimes chat as they walked their dogs.

On the evening of October 22, 1993, Ms. Sugeng had plans to meet two friends for a movie. When Ms. Sugeng did not appear at the movie theater, her friends repeatedly attempted to telephone her and then went to her apartment. There, Ms. Sugeng's friends found her face down in the bathtub, unconscious. The attempts to resuscitate Ms. Sugeng were unsuccessful, and she died.

A subsequent investigation of Ms. Sugeng's apartment revealed, among other things, two blood stains on the living room floor. Near those blood stains was a baseball cap in which hairs were subsequently found. A pair of torn pink undergarments was found near Ms. Sugeng's bed, and bloodstains were found on her bed.

The baseball cap found in Ms. Sugeng's apartment was later traced to Mr. Mollett,

who admitted that the cap was his. The bloodstains in the living room were identified as Ms. Sugeng's blood. The stain on the bed contained both Ms. Sugeng's blood and Mr. Mollett's semen. Mr. Mollett's semen was also detected on the vaginal swabs later taken by the medical examiner. A medical examiner examined Ms. Sugeng's body and found contusions and bruises on her cheek and under her chin and inner lips, a contusion on her chest, bruising on her hips, and lacerations both inside and just outside Ms. Sugeng's vagina. Injuries consistent with defensive wounds were found on Ms. Sugeng's hands, wrists, and forearms. Further, marks on Ms. Sugeng's throat, in conjunction with petechial hemorrhaging, indicated that she had been strangled. Ms. Sugeng's lungs and trachea were filled with fluid in a manner associated with drowning. The medical examiner ultimately concluded the cause of death to be asphyxia from either drowning or neck compression.

Mr. Mollett was arrested shortly thereafter and in 1995, he was tried by a Payne County, Oklahoma jury. After the jury convicted Mr. Mollett of rape and first-degree murder, the State sought the death penalty, arguing that three of the aggravating factors that can trigger the imposition of the death penalty under Oklahoma law were present: (1) that the murder was "especially heinous, atrocious or cruel;" (2) that Mr. Mollett committed the murder "to avoid lawful arrest or prosecution;" and (3) that Mr. Mollett was a "continuing threat to society." Okla. Stat. tit. 21, § 701.12.

Oklahoma law provides for three possibilities when a defendant is charged with a

crime for which the prosecution seeks the death penalty. First, if the prosecution proves that a statutory aggravator is present, and the jury does not find that mitigating evidence outweighs the aggravator, the death penalty may be imposed. See Okla. Stat. tit. 21, § 701.11. Second and third, the jury, or, absent agreement between among the jurors, the trial judge, may "impose a sentence of [either] imprisonment for life without parole or imprisonment for life." Id. (emphasis supplied).

Approximately one month before Mr. Mollett's trial, Mr. Mollett's trial counsel requested that the jury be instructed under Simmons v. South Carolina,

512 U.S. 154 (1994):

> that [opinion] addresses life in prison without parole. . . . it stands for the proposition that there is a chance that a jury may believe it does not really mean life without parole. And we would request they be instructed on that issue. But I would like to put the Court on notice by virtue of Simmons.

Tr. of Dec. 6, 1999 Proceedings, at 8. Mr. Mollett's trial counsel followed that request with a written request that the court instruct the jury that:

> when considering punishment that life imprisonment means imprisonment for life. You are further instructed that the death penalty means that the Defendant will be put to death. You are also instructed that life without parole means that the Defendant will be in the penitentiary for all of his life with no possibility of parole. You should draw no other conclusions concerning punishment other than what is stated in this instruction.

State Ct. Rec. vol. III, at 464 (Defendant's Requested Second Stage Jury Instructions filed Jan. 19, 1995).

The district court did not agree to the requested jury instruction. At the trial's

- 5 -

sentencing stage, the State introduced evidence of Mr. Mollett's three prior felony convictions. Additionally, the State incorporated all guilt-stage evidence and presented victim-impact evidence from Ms. Sugeng's family. At the sentencing hearing, Mr. Mollett presented seven mitigation witnesses who testified to a variety of mitigating circumstances, including his health problems and also to various qualities of Mr. Mollett, such as that he is a good person who is loved, loving, helpful, thoughtful, generous, hard-working, kind, an animal lover, and non-violent.

After the conclusion of the presentation of evidence in the trial's sentencing stage, the trial judge instructed the jury. Over the objection of Mr. Mollett's counsel, the trial judge instructed that "[t]he crime of Murder in the First Degree is punishable by death or by imprisonment for life without parole, or by imprisonment for life." Id. at 441. No further definition of any of the sentencing options was given to the jury. See id. at 439-51.

During closing arguments, the prosecutor repeatedly stressed that the jury should find that Mr. Mollett constituted a continuing threat to society:

> The State has alleged that this defendant is a continuing threat to society. He always will be [a continuing threat] is what the evidence establishes: . . . . Look at the nature of the crime itself when determining whether continuing threat exists, and the circumstances surrounding the entire picture of these crimes.
> He stalked her. This was not a crime of rage committed in a heat of the moment. This was a crime of design, or premeditation, and of planning. The evidence was revealed that Mr. Mollett had copies of the pass keys to Forty North apartments. [Ms. Sugeng] would not have been safe from him even behind locked doors. And [Ms. Sugeng] . . . is no different from the rest of us. . . . Look at the severity of the injuries, the callous and brutal nature of the crime itself.

We have a torn vagina and hymen which we know a knife did not cause. We know there are two books of a sexual nature in that apartment. And according to the friends who have discussed more with [Ms. Sugeng] than her dog and the weather, they did not belong to her.

Because of the extent of the vaginal wounds one could reasonably infer that her assault involved repeated acts of rape and penetration. This was a rape of degradation, humiliation, and intense pain designed to punish her for refusing his attentions and rejecting his offers.

Let's examine more of the evidence to see the callousness of this crime before you. All evidence from the first stage has been introduced into this stage, including the testimony of the defendant himself. Usually in your experience have you not found that even in a lie there are tidbits and moments of truth, those things that reveal how a person's mind works?

Examine the terms the defendant used when describing his relationship and actions with [Ms. Sugeng.] I hit on her, we just got it on, I put her back and her butt on the bed with her legs up in the air.

These are not terms of respect of another human being. They are not describing a caring relationship. He had no regard for her as a person or her left behind body. The defendant testified in cross examination that he knew [Ms. Sugeng's] family was coming to see her that weekend. He chose Friday to murder her. He left her in a tub dumped. That is callous.

Look at the scenario of what happened in that apartment that evening. We go from bedroom to living room to bathroom. She couldn't get away from him. She tried as she ran bleeding into the living room. When he took her into the bathroom there might have been hope in her mind that maybe, maybe he's just trying to wash the evidence away and he'll leave.

But hope was not there for [Ms. Sugeng]. He strangled her, he pushed her mouth under the water, and water was all she could breathe until she could breathe no more. And that's where he left her. And that's callous.

The defendant never would admit during his testimony on cross that he was in the bathroom that evening. Obviously the evidence suggests otherwise. And as [Ms. Sugeng] lay dead or dying in the tub the defendant picked up a towel to clean his genitals, [Ms. Sugeng's] blood from him, throws it onto the floor, turns off the light, – remember it's the only light in the apartment off – goes home to wash the evidence way, discards his bloody jeans there, goes to [a friend's] house where he lays down on the couch and watches TV.

That's callous. That's disregard for human life. That's disrespect for the dead. That's callous.

Even then he had a chance, an opportunity, a choice to prevent friends from walking into that death scene and finding a person they loved. He could

have made anonymous calls to anybody, anyone but her family or friends so they didn't have to find that. He chose not to. He covers up his crime all the way from setting it up beforehand to the thirteen pubic hairs he threw on the floor, to going back to Ron's house, to telling the police never the truth. And that's callous.

He has a criminal history that's indicative of a progression of anti-social behavior. Receiving stolen property, concealing stolen property, burglary in the second degree. Those are felony offenses, Ladies and Gentlemen. They're not minor crimes. They weren't all committed at the same time. He wasn't a child when he committed them.

He committed the first one and he was sentenced for it, and it did nothing. He committed more crimes. He committed the second one, he was sentenced for it, and that did nothing, and he went out and committed some more crimes.

He committed the third one, was convicted for it, and that did nothing. And now we're here today in a rape and murder. It can't get any more violent than this man has become.

Trial trans. vol. VII, at 66-71 (emphasis supplied). After trial counsel for Mr. Mollett completed his closing argument, the prosecution continued to argue, in rebuttal, that Petitioner constituted a continuing threat to society:

They say prison is good enough, he can't get out. The people he meets there, the people he influences there, the people in contact with that mind there, they'll come out. Not everyone in prison's [sic] in there forever. And the cycle beings again.

The risk to society is too great. It's said that locking up a person for the rest of his life is more cruel than executing him. That's not so. For as long as an evilness in a mind survives it loves the wickedness. That's what wickedness is.

They say Lloyd Mollett is not Ted Bundy and not Roger Dale Stafford. That they're different. They're killers. What made Bundy different than Lloyd Mollett is he was allowed to kill again until he finally received the death penalty.

Id. at 80-81 (emphasis supplied).

Following the closing arguments, the jury retired to deliberate concerning Mr.

- 8 -

Mollett's sentence. Sometime after deliberations began, the jury sent the judge a note which telegraphed the key issue in this appeal: "Judge can you tell us if we find a sentence of Life without parole is the[re] any possibility of Mr. Mollett ever leaving prison for any reason whatsoever"? Tr. Trans. vol. VII (note stapled to back cover of transcript). The parties agree that there is no indication of exactly when the note was sent. Unfortunately, the trial judge did not inform either side's counsel of the note, nor did the trial court provide Mr. Mollett with an opportunity to demonstrate to the jury that he would be ineligible for parole under Oklahoma law. The trial judge did, as indicated previously, respond to the jury in writing that "[m]atters of parole are beyond the purvue [sic] of the jury or the court to consider." Id.

Sometime following the receipt of the trial judge's answer, the jury returned its verdict. The jury found the existence of two aggravating circumstances beyond a reasonable doubt–that the murder was especially heinous, atrocious or cruel; and that Mr. Mollett committed the murder to avoid lawful arrest or prosecution–but did not find that the prosecution had shown beyond a reasonable doubt that Mr. Mollett would be a continuing threat to society. The jury recommended that Mr. Mollett be sentenced to death plus seventy-five years' imprisonment. Tr. Trans. vol. VII, at 85-86.

Mr. Mollett filed a direct appeal in the Oklahoma Court of Criminal Appeals raising fourteen propositions of error, including his claim that the trial judge's answer to the jury's question regarding the meaning of life imprisonment without parole violated his

due process rights. The Oklahoma Court of Criminal Appeals affirmed, holding on the due process issue that "[a]lthough a jury may logically consider the possibility or absence of parole in determining the sentence a capital murder defendant is to receive, there is no requirement for a trial judge to explain the Oklahoma parole process to a jury," Mollett v. State, 939 P.2d 1, 11 (Okla. Crim. App. 1997) (internal citations and quotation marks omitted), and stating that "[t]he concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further. Consequently, we find no error." Id. (internal quotation marks omitted). Two of the Oklahoma Court of Criminal Appeals judges disagreed, stating that they "believe [the trial judge] should provide a meaningful answer to questions from the jury when they ask, as they often do, about the meaning of life without parole." Mollett, 939 P.2d at 15 (Chapel, J. and Strubhar, J., concurring).

Subsequently, after unsuccessfully petitioning for a writ of certiorari from both the Oklahoma Supreme Court and the United States Supreme Court and unsuccessfully seeking post-conviction relief in the Oklahoma Court of Criminal Appeals, Mr. Mollett sought habeas relief in federal district court, where he again argued that the trial court's response to the jury's question denied him due process.[1] Relying on this court's

---

[1] Mr. Mollett argued in his habeas petition that his Eighth and Fourteenth Amendment rights were violated. However, because Simmons only addressed the Fourteenth Amendment, see Simmons, 512 U.S. at 162 n.4 (plurality), and because the parties on appeal limited their arguments to that amendment, we limit our discussion to the Fourteenth Amendment.

application of Simmons in Johnson v. Gibson, 254 F.3d 1155, 1165-67 (10th Cir.), cert. denied, 534 U.S. 1029, 534 U.S. 1036 (2001), the district court held in a detailed memorandum opinion that the trial court's response to the jury's question violated Mr. Mollett's due process rights because it did not refer to the original instructions and, instead, contradicted them by telling the jury that parole eligibility could not be considered when it could and should be, as parole eligibility was the only difference between life and life without parole. See Rec. vol. I, doc. 44 (Dist. Ct. Memorandum Op., dated Oct. 16, 2001). Thus, the district court found that the trial court's answer to the jury's question created a "false dilemma," thereby entitling Mr. Mollett to habeas relief under Simmons. Id. at 12. The State appeals.

## II. DISCUSSION

### A. Standard of Review

Because Mr. Mollett's habeas petition was filed on November 2, 1998, after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA governs whether Mr. Mollett may obtain relief from his death sentence. Under AEDPA, because Mr. Mollett's claim was adjudicated on the merits in state court, he is entitled to federal habeas relief only if he can establish that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The

Supreme Court recently stated that "[w]e have made clear that the 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 123 S. Ct. 2527, 2534-35 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "In other words," the Court stated, "a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" Id. at 2535 (quoting Lockyer v. Andrade, 123 S. Ct. 1166, 1175 (2003)).

**B.      Analysis**

The State advances two arguments as to why the Oklahoma trial court's response to the jury's question concerning the meaning of life without parole was not contrary to clearly established federal law as determined by the Supreme Court: (1) Simmons "does not apply to triple-option sentencing schemes like Oklahoma's," Aplt's Br. at 16; and (2) even if Simmons applies to Oklahoma's capital sentencing scheme, Simmons does not apply to this case because "[n]o such false choice arose in the instant case." Aplt's Br. at 20. We address each contention in turn.

**1.      Does Simmons apply to Oklahoma's capital sentencing scheme?**

In Johnson, 254 F.3d 1155, this court analyzed whether the instructions by

the trial court in that case regarding Oklahoma's capital punishment sentencing scheme violated <u>Simmons</u> or <u>Simmons</u>' successor case, <u>Shafer v. South Carolina</u>, 532 U.S. 36 (2001). The trial court in <u>Johnson</u> had instructed the jury on the three Oklahoma sentencing options. During deliberations, the jury asked whether life without parole meant the defendant could never be paroled, and the trial court responded that "'[i]t is inappropriate for you to consider the question asked.'" <u>Johnson</u>, 254 F.3d at 1164.

We held in <u>Johnson</u> that the state trial court's answer violated <u>Simmons</u> and <u>Shafer</u>, and therefore reversed the federal district court's dismissal of the habeas petition. The majority opinion in <u>Johnson</u> recognized that Oklahoma law (permissibly) precludes instruction on the inner workings of the parole system, but noted that this preclusion "does not obviate the need for a correct instruction concerning the three options, including life without parole." <u>Johnson</u>, 254 F.3d at 1165 (citing <u>Simmons</u>, 512 U.S. at 166). "That a state may limit the information given to juries about parole," we noted, "<u>does not eliminate the need to inform the jury of parole ineligibility where future dangerousness is at issue.</u>" <u>Id.</u> (citing <u>Simmons</u>, 512 U.S. at 168-69) (emphasis supplied).

The Oklahoma instructions at issue in this case are the same as those that were at issue in <u>Johnson</u>. <u>See</u> <u>Johnson</u>, 254 F.3d at 1165 ("In this case, the trial judge instructed the jury on its three discrete sentencing options available under Oklahoma law – death, life imprisonment[,] and life imprisonment without the possibility of parole."). Nonetheless, the State argues that "this Court has not addressed the State's assertion that

- 13 -

Simmons is inapplicable to Oklahoma's triple-option sentencing scheme." Aplt's Br. at 17.

We disagree. We did *not* in Johnson reserve the issue of the applicability of Simmons to Oklahoma's sentencing scheme by assuming without deciding that Simmons applied; rather, a necessary logical predicate to our holding was that the trial judge's instructions violated Simmons, and therefore, that Simmons applied. The State's argument is therefore foreclosed by Johnson.

Moreover, even if the issue were an open one, we do not see why Simmons' "false choice concern" should apply any less to Oklahoma's sentencing scheme. As we recognized in Johnson, "Simmons rests upon eliminating a jury's misunderstanding so the jury will not perceive a 'false choice' between sentencing to death or a limited period of incarceration when future dangerousness is at issue." Id. at 1166. We also note that the Oklahoma Court of Criminal Appeals cited and distinguished Shafer and Johnson in Williams v. State, 31 P.3d 1046, 1050 (Okla. Crim. App. 2001), noting that in Williams, unlike in Shafer and Johnson, "the jury was not presented with a 'false choice' as to its sentencing options." (citing Johnson, 254 F.3d at 1167 (Henry, J., concurring)). As evidenced by the facts of Johnson and those of this case, this concern is no less potentially implicated by Oklahoma's capital sentencing scheme than those of other states. Accordingly, we reject the State's argument that Simmons is inapplicable to Oklahoma's capital sentencing scheme.

- 14 -

**2. Did the district court in this case create a "false choice" under <u>Simmons</u> in violation of Mr. Mollett's due process rights?**

Next, argues the State, even if <u>Simmons</u> does apply to Oklahoma's capital sentencing scheme, <u>Simmons</u> does not apply because no "false choice" arose in this case. The State argues that because the jury in Mr. Mollett's case did not find that the prosecution had proven that Mr. Mollett was a continuing threat to society, "Mr. Mollett is [therefore] not entitled to relief because unlike the juries in <u>Simmons</u>, <u>Shafer</u>, and <u>Johnson</u>, Mollett's jury actually rejected a statutory aggravator requiring a finding that [Mr.] Mollett was a continuing threat to society." Aplt's Br. at 17.[2] The State's view reflects an unjustifiably narrow reading of those three cases, which we now turn to discuss in some detail to illustrate this important point.

First, in <u>Simmons</u>, 512 U.S. 154, the Supreme Court reviewed South Carolina's capital sentencing scheme, which "ha[d] a life-without-parole sentencing alternative to capital punishment for some or all convicted murderers but refuse[d] to inform sentencing juries of th[at] fact." <u>Id.</u> at 168 n.8. However, the defendant in <u>Simmons</u> was parole ineligible under that scheme because of prior convictions for crimes of violence. <u>See</u> S.C. Stat. Ann. § 24-21-640; <u>Simmons</u>, 512 U.S. at 156 (plurality opinion); <u>id.</u> at 176

---

[2] We note that this argument is somewhat misleading, because the juries in <u>Simmons</u> and <u>Shafer</u> could not have "rejected a statutory aggravator" finding that the defendant "was a continuing threat to society," Aplt's Br. at 17, because South Carolina's statutory aggravators do not include the defendant's potential future dangerousness. <u>See</u> S.C. Stat. Ann. §16-2-20(C)(a)(1)-(11).

- 15 -

(O'Connor, J., concurring). The jury, in a note to the judge during sentencing deliberations, asked: "Does the imposition of a life sentence carry with it the possibility of parole?" Id. at 160 (plurality opinion). Over defense counsel's objection, the trial judge in Simmons instructed: "Do not consider parole or parole eligibility [in reaching your verdict]. That is not a proper issue for your consideration." Id. After receiving this response from the court, the jury in Mr. Simmons' trial returned a sentence of death, which Mr. Simmons unsuccessfully sought to overturn on appeal to the South Carolina Supreme Court. Id. at 160-61.

A divided Supreme Court reversed the South Carolina Supreme Court. Justice Blackmun's plurality opinion, joined by Justices Souter and Ginsburg, explained that the trial court had violated the defendant's Fourteenth Amendment due process rights because "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness, while, at the same time, preventing the jury from learning that the defendant never will be released on parole." Id. at 171 (emphasis supplied). The plurality noted that "[w]hile juries ordinarily are presumed to follow the court's instructions, we have recognized that in some circumstances the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Id. (internal quotations and citations omitted).

Similarly, Justice Souter, joined by Justice Stevens, concurred, stating that "juries

- 16 -

in general are likely to misunderstand the meaning of the term 'life imprisonment' in a given context," and that therefore "the judge must tell the jury what the term means, when the defendant so requests." Id. at 174 (Souter, J., concurring) (emphasis supplied). "It is, moreover, clear," stated Justice Souter, "that at least one of these particular jurors did not understand the meaning of the term, since the jury sent a note to the judge asking, 'Does the imposition of a life sentence carry with it the possibility of parole?' The answer here was easy and controlled by state statute. The judge should have said no." Id.

Justice O'Connor, joined by Chief Justice Rehnquist and Justice Kennedy, also concurred, holding that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury–by either argument or instruction–that he is parole ineligible." 512 U.S. at 178 (O'Connor, J., concurring) (emphasis supplied). In Simmons, "Justice O'Connor's three Justice concurrence represented the narrowest grounds for a holding and, as such, represents the holding of the Court." Smallwood v. Gibson, 191 F.3d 1257, 1280 n.15 (10th Cir. 1999).

The Court's holding in Simmons via Justice O'Connor's concurrence also relied in part on the concern about the judge's instructions creating a false choice articulated by the plurality:

> The prosecutor in this case put petitioner's future dangerousness in issue, but petitioner was not permitted to argue parole ineligibility to the capital

- 17 -

sentencing jury. Although the trial judge instructed the jurors that "the terms life imprisonment and death sentence are to be understood in their pla[i]n and ordinary meaning," I cannot agree with the court below that this instruction satisfied in substance petitioner's request for a charge on parole ineligibility. The rejection of parole by many States (and the Federal Government) is a recent development that displaces the longstanding practice of parole availability, and common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole. While it may come to pass that the "plain and ordinary meaning" of a life sentence is life without parole, that the jury in this case felt compelled to ask whether parole was available shows that the jurors did not know whether or not a life-sentenced defendant will be released from prison. Moreover, the prosecutor, by referring to a verdict of death as an act of "self-defense," strongly implied that petitioner would be let out eventually if the jury did not recommend a death sentence.

Simmons, 512 U.S. at 177-78 (O'Connor, J., concurring) (emphasis supplied) (citations

and select internal quotation marks omitted).[3]

---

[3] Justice Ginsburg concurred separately, emphasizing that due process requires that "[w]hen the prosecution urges a defendant's future dangerousness as cause for the death sentence, the defendant's right to be heard means that he must be afforded an opportunity to rebut the argument." Simmons, 512 U.S. at 174 (Ginsburg, J., concurring). "To be full and fair," Justice Ginsburg stated, "that opportunity must include the right to inform the jury, if it is indeed the case, that the defendant is ineligible for parole." Id. at 174.

There is considerable support for Judge Chapel's and Judge Strubhar's views that the court "should provide a meaningful answer to questions from the jury when they ask, as they often do, about the meaning of life without parole." Mollett, 939 P.2d at 15 (Chapel, J. and Strubhar, J., concurring). In Simmons, Justice O'Connor observed the logical confusion of the jurors, when she stated that "[t]he rejection of parole by many States (and the Federal Government) is a recent development that displaces the longstanding practice of parole availability, and common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole." 512 U.S. at 177-78 (O'Connor, J., concurring). Justice Thomas also noted in Kelly, that "[a]s a matter of policy, it may be preferable for a trial court to give such a[] [clarifying] instruction." Kelly, 534 U.S. at 265 (Thomas, J., dissenting). And South Carolina, after three losses before the United States Supreme Court, has finally amended its statute to read as follows: "For purposes of this section, 'life imprisonment' means until death of the offender without the possibility of parole, and when requested by the State or the

- 18 -

Second, in Shafer, 532 U.S. at 40, the Supreme Court clarified the application of Simmons to South Carolina's capital sentencing scheme as amended by the South Carolina legislature in response to Simmons. Under the amended capital sentencing scheme, the jury first considered whether the State proved any aggravators beyond a reasonable doubt. See Shafer, 532 U.S. at 40. If the jury did not find an aggravator, it did not make a sentencing recommendation, and the trial court would sentence the defendant to either life imprisonment or a mandatory minimum sentence. Id. at 40-41. If the jury, however, did find at least one aggravator, it would recommend a sentence of either death or life without parole. Id. at 41. In Shafer, the jury had returned a death sentence after first being instructed that life imprisonment meant imprisonment until the defendant's death and was later instructed by the court, in response to its questions, that it was not to consider parole eligibility. The defendant, however, actually was parole ineligible.

Reaffirming its holding in Simmons, the Court held "that whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole." Shafer, 532 U.S. at 51 (emphasis supplied). In doing so, the majority emphasized that the jury's comprehension was not aided by the trial court's response to the jury's question, and instead, the response misled the jury about the

_____

defendant, the judge must charge the jury in his instructions that life imprisonment means until the death of the defendant without the possibility of parole." S.C. Stat. Ann. § 16-3-20(A) (emphasis supplied).

availability of parole, creating the potential for a false choice:

> [W]hen the jury determines the existence of a statutory aggravator, a tightly circumscribed factual inquiry, none of <u>Simmons</u>' due process concerns arise. There are no "misunderstanding[s]" to avoid, no "false choice[s]" to guard against. The jury, as aggravating circumstance factfinder, exercises no sentencing discretion itself. . . . <u>It is only when the jury endeavors the moral judgment whether to impose the death penalty that parole eligibility may become critical.</u> Correspondingly, it is only at that stage that <u>Simmons</u> comes into play, a stage at which South Carolina law provides no third choice, . . . just death or life without parole.

<u>Id.</u> at 51 (quoting <u>Simmons</u>, 512 U.S. at 161) (emphasis supplied). The Court noted that the jury should be informed of the defendant's parole ineligibility regardless of whether the jury or the trial court makes the ultimate sentencing decision. <u>See</u> <u>id.</u> at 51 n.5.

Third, this circuit's decision in <u>Johnson</u> is relevant because, although not controlling, on-point "federal case law inferior to Supreme Court precedent, may serve as a guide in determining reasonableness of [a] state court's application of Supreme Court law." <u>Bryson v. Ward</u>, 187 F.3d 1193, 1205 (10th Cir. 1999). In <u>Johnson</u>, both the majority and concurring opinions noted that "<u>Simmons</u> rests upon eliminating a jury's misunderstanding so the jury will not perceive a 'false choice' between sentencing to death or a limited period of incarceration when future dangerousness is at issue." <u>Johnson</u>, 254 F.3d at 1166; <u>id.</u> at 1167 (Henry, J., concurring) (stating that "the key to understanding <u>Simmons</u>–and therefore <u>Shafer</u>–is the concept of 'false choice', that is a choice that may be misleading to the jury," and collecting opinions from multiple jurisdictions to that effect). Our holding relied in part on this concern about the potential for a false choice

- 20 -

creating juror confusion:

> [T]he trial court's instruction that it was inappropriate for the jury to consider parole eligibility did not refer the jury back to the instructions; rather, it plainly contradicted those instructions. The trial court did more than give a non-responsive answer–it told the jury that parole eligibility could not be considered when plainly it could be. <u>At best, the jury had a conflict between the court's instructions as to whether it was proper to consider parole eligibility in imposing sentence. At worst, the jury may very well have thought that parole was available, even with the life without parole option, but for some unknown reason it could not consider that fact</u>.

<u>Johnson</u>, 254 F.3d at 1166 (emphasis supplied).

Turning to the State's argument here, with these binding precedents in mind, we reject the State's argument that no "false choice" under <u>Simmons</u> was created by the trial court in Mr. Mollett's case. Under <u>Simmons</u>, a defendant's due process rights are violated in cases like the instant one where: (1) the prosecution seeks the death penalty; (2) the prosecution places the defendant's "future dangerousness . . . at issue," <u>Shafer</u>, 532 U.S. at 51; (3) the jury asks for clarification of the meaning of "life imprisonment," or a synonymous statutory term, <u>Shafer</u>, 532 U.S. at 45; and (4) the judge's response threatens to cause "a jury's misunderstanding so the jury will . . . perceive a 'false choice' of incarceration when future dangerousness is at issue." <u>Johnson,</u> 254 F.3d at 1166; <u>see also</u> <u>Shafer</u>, 532 U.S. at 51 ("<u>Simmons</u>' due process concerns arise" if there are "'misunderstanding[s]' to avoid, [or] 'false choice[s]' to guard against.") (quoting <u>Simmons</u>, 512 U.S. at 161).

Contrary to the State's argument, nothing in these cases limits <u>Simmons</u>'

applicability to situations where the jury does not find a continuing threat aggravator to apply after the prosecution places the defendant's future dangerousness at issue. See, e.g., Kelly v. South Carolina, 534 U.S. 246, 254 n.4 (2002) ("The only questions in this case are whether the evidence presented and the argument made at [the defendant's] trial placed future dangerousness at issue. The answer to each question is yes and we need go no further than Simmons in our discussion."); cf. Neill v. Gibson, 278 F.3d 1044, 1063 (10th Cir. 2001) ("[The defendant] relies on Simmons v. South Carolina; that decision concerned capital cases where a defendant's future dangerousness is at issue. Here, however, the State did not charge [the defendant] with the continuing threat aggravator.") (internal citation omitted).

Mr. Mollett satisfies each of the four elements. First, this is, of course, a capital case.

Second, the State placed future dangerousness at issue. This is so in several senses. Most obvious is that the State charged Mr. Mollett with the continuing threat aggravator. See Tr. Trans. vol. VII, at 66-71 (prosecutor's closing argument). Thus, the "argument made at [Mr. Mollett's] trial placed future dangerousness at issue." Kelly, 534 U.S. at 254 n.4.

Further, and more significantly, the prosecution's arguments to the jury placed Mr. Mollett's future dangerousness squarely at issue. The prosecution stated that "[t]he State has alleged that this defendant is a continuing threat to society. He always will be [a

- 22 -

continuing threat] is what the evidence establishes." Tr. Trans. vol. VII, at 66-67. In addition, the prosecution argued that Mr. Mollett "stalked" Ms. Sugeng. Id. at 67. The prosecution stated that "[Ms. Sugeng] would not have been safe from [Mr. Mollett] even behind locked doors. And [Ms. Sugeng] is no different from the rest of us." Id. Moreover, the prosecution argued that Mr. Mollett "has a criminal history that's indicative of a progression of anti-social behavior. Receiving stolen property, concealing stolen property, burglary in the second degree. Those are felony offenses, Ladies and Gentlemen. They're not minor crimes." Id. at 70. Finally, the prosecutor proclaimed, speaking of Mr. Mollett, that "[i]t can't get any more violent than this man has become." Id. at 71.

From all this, it is evident that, "the evidence presented at [Mr. Mollett's] trial placed future dangerousness at issue." Kelly, 534 U.S. at 254 n.4. Indeed, in Kelly, the Supreme Court rejected the South Carolina Supreme Court's characterization of the prosecutor's closing argument, which discussed evidence that the defendant had been involved in previous attempted escapes from prison and that the defendant carried a shank, as merely "evidence as going only to Kelly's likely behavior in prison, or to his proclivity to escape from it." 534 U.S. at 253. Specifically, the Court noted:

> The state court to be sure considered the prosecutor's comparison of Kelly to a notorious serial killer, variously calling him a "dangerous" "bloody" "butcher." The court nonetheless thought it could somehow cordon off these statements as raising nothing more than a call for retribution. But the import of the argument simply cannot be compartmentalized this way. Characterizations of butchery did go to retribution, but that did not make them any the less

arguments that Kelly would be dangerous down the road. They complemented the prosecutor's submissions that Kelly was "more frightening than a serial killer," and that "murderers will be murderers." Thus was Kelly's jury, like its predecessor in <u>Simmons</u>, invited to infer "that petitioner is a vicious predator who would pose a continuing threat to the community."

<u>Id.</u> at 255-56 (internal citations and footnotes omitted) (emphasis supplied). The Court concluded that the prosecutor had indeed raised a "clear implication of future dangerousness" to the jury, <u>id.</u> at 255, and criticized the South Carolina "Supreme Court's attempt to portray the thrust of the evidence as so unrealistically limited." <u>Id.</u> at 254.

This case presents <u>both</u> the many references to evidence that Mr. Mollett was a continuing threat <u>and</u> the charge of the continuing threat aggravator; the facts thus demonstrate that the State placed Mr. Mollett's future dangerousness at issue during his trial's sentencing phase. The second <u>Simmons</u> element is therefore satisfied.

The third element of a <u>Simmons</u> violation–whether the jury asks for clarification of the meaning of "life imprisonment," or a synonymous statutory term, <u>Shafer</u>, 532 U.S. at 45–is also satisfied here. The jury asked for a definition of "life imprisonment" as used in Okla. Stat. tit. 21, § 711.11, by its written question to the trial judge: "Judge can you tell us if we find a sentence of Life without parole is the[re] any possibility of Mr. Mollett ever leaving prison for any reason whatsoever." Tr. Trans. vol. VII (note stapled to back cover of transcript). "[T]hat the jury . . . felt compelled to ask whether parole was available shows that the jurors did not know whether . . . a life-sentenced defendant will be released from prison." <u>Simmons</u>, 512 U.S. at 178 (O'Connor, J., concurring); <u>cf. Shafer</u>, 532 U.S.

- 24 -

at 53 (stating that the "jury left no doubt about its failure to gain from defense counsel's closing argument or the judge's instructions any clear understanding of what a life sentence means").

Fourth, the trial court's supplemental instruction that "[m]atters of parole are beyond the purvue [sic] of the jury or the court to consider" threatened to cause "a jury's misunderstanding" that the jury would "perceive a 'false choice' between sentencing to death or a limited period of incarceration when future dangerousness is at issue." Johnson, 254 F.3d at 1166. The trial judge thus "did nothing to ensure that the jury was not misled," and its response "may well have been taken to mean 'that parole was available but that the jury, for some unstated reason, should be blind to this fact.'" Shafer, 532 U.S. at 53 (quoting Simmons, 512 U.S. at 170)(plurality)) (emphasis in original). Due to the trial court's response, the jury was "left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested." Simmons, 512 U.S. at 165-66 (plurality).

The trial court's refusal to explain to the jury the distinguishing feature under Oklahoma law between life imprisonment and life imprisonment without parole, and its choice instead to affirmatively instruct the jury that parole was not to be considered, created serious potential for jury confusion on that question. The Supreme Court has warned that "accurate sentencing information is an indispensable prerequisite to a

- 25 -

reasoned determination of whether a defendant shall live or die." Gregg v. Georgia, 428

U.S. 153, 190 (1976) (plurality). Simmons, Shafer, and Johnson all reflect the importance

of the jury being given access to accurate parole information when the prosecution places

future dangerousness at issue. The trial court's instruction that the jury not consider parole

in this sense defeated the jury's sentencing choice, which included the option of life

imprisonment without parole, see Simmons, 512 U.S. at 167 n.7 (plurality) (noting that

Oklahoma law allows a criminal jury in a first-degree murder "to specify whether the

defendant should or should not be eligible for parole"), and therefore created the "false

choice" prohibited by the Due Process Clause of the Constitution's Fourteenth

Amendment as interpreted by Simmons and its progeny. Mr. Mollett has satisfied the

elements of a Simmons violation. We hold that the Oklahoma Court of Criminal Appeals's

rejection of Mr. Mollett's due process claim was "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States." 28 U.S.C. § 2254(d)(1).

### 3. The dissent's application of Simmons

The dissent concludes that Simmons and Shafer do not apply to Oklahoma's

weighing-based death penalty scheme when, as here, the jury did not find a continuing

threat aggravator. According to the dissent, Simmons and Shafer involve a non-weighing

scheme in which the jury properly "exercises its unfettered moral judgment in determining

whether the defendant should be sentenced to life imprisonment or death." Dissent at 5.

In contrast, under Oklahoma's weighing-based scheme, if the jury finds the existence of

one or more aggravating circumstances, the jury's task is then "narrowly circumscribed to

determining whether the aggravating circumstance(s) proved by the prosecution beyond a

reasonable doubt outweigh the defendant's evidence in mitigation." Dissent at 8 (citing

Okla. Stat. Ann. tit. 21, § 701.11; Irvin v. State, 617 P.2d 588, 598 (Okla. Crim. App.

1980)). The dissent implies that, because the jury here did not find the continuing threat

aggravator beyond a reasonable doubt, the prosecution's allegations regarding Mr.

Mollett's future dangerousness were not relevant to the jury's decision whether to impose

the death penalty. As a result, the trial judge's refusal to explain the sentencing option of

life without parole did not present the jury with the "false choice" prohibited by Simmons.

For several reasons, the dissent's logic is flawed. First and foremost, as

emphasized above, there is no question that Simmons and its progeny apply to Oklahoma's

scheme. See Johnson, 254 F.3d at 1166; Williams, 31 P.3d at 1050.

The dissent also ignores the clear language of the Simmons line of cases that it is the

prosecution's placing the defendant's future dangerousness at issue that potentially creates

the "false choice." See Kelly, 534 U.S. at 248 ("Last Term, we reiterated the holding of

Simmons v. South Carolina, that when 'a capital defendant's future dangerousness is at

issue, and the only sentencing alternative to death available to the jury is life imprisonment

without possibility of parole, due process entitles the defendant to inform the jury of [his]

- 27 -

parole ineligibility, either by a jury instruction or in arguments by counsel.'" (quoting

Shafer, 532 U.S. at 39) (internal citations and quotation marks omitted); Johnson, 254

F.3d at 1166 ("Simmons rests upon eliminating a jury's misunderstanding so the jury will

not perceive a 'false choice' between sentencing to death or a limited period of

incarceration when future dangerousness is at issue."); Williams, 31 P.3d at 1050

(Oklahoma Court of Criminal Appeals' recognizing that a "false choice" could be created

if additional "instructions by the trial court . . . conflict with the uniform instruction and

confuse the jury as to the meaning of the available sentencing options") (citing Shafer and

Johnson).  In Oklahoma, the Simmons protections are in play when false choices arise –

namely when the prosecution places the matter at issue by charging the continuing threat

aggravator and the trial court gives conflicting instructions in response to the jury's inquiry

regarding parole.[4]  See Williams, 31 P.3d at 1050.  Under South Carolina's scheme, the

---

[4]  We disagree with the dissent's contention that, under the majority's theory, "a
defendant in Oklahoma would be entitled to a jury instruction about parole eligibility
even if the prosecution did not allege the continuing threat aggravating circumstances, so
long as any of the evidence adduced in support of any other aggravating circumstance
might also be relevant to future dangerousness."  Dissent at 10, n.4.  We note that, as in
Kelly,

> this is not an issue here, nor is there an issue about a defendant's
> entitlement to instruction on a parole ineligibility law when the
> State's evidence shows future dangerousness but the prosecutor
> does not argue it.  The only questions in this case are whether
> the evidence presented and the argument made at [Mr.
> Mollett's] trial placed future dangerousness at issue.  The
> answer to each question is yes, and we need go no further than
> Simmons in our discussion.

Kelly, 534 U.S. at 254 n.4.

Simmons protections are triggered when the prosecution places the matter at issue by referring to evidence of future dangerousness during trial.  See Kelly, 534 U.S. at 254 n.4.

Second, the dissent's rigid division of the jury's deliberations into an "eligibility step" and an "imposition step" misreads Simmons and Shafer.  Dissent at 6-7.  Although the jury here was required to determine the existence of the alleged aggravating factors before proceeding to the question of whether to impose the death penalty, the trial judge was neither required nor allowed to monitor those deliberations.  Thus, when the jury asked about the meaning of life without parole, the judge did not know whether the jury was debating the existence of the continuing threat and other aggravators or whether it had proceeded to weighing aggravating and mitigating circumstances to determine if the death penalty was warranted.  Regardless of the "step" of the jury's deliberations, the judge's response must not create a false choice dilemma.  See Johnson, 254 F.3d at 1166.  The dissent's supposition that a Simmons violation can only occur during a discrete "imposition step" of jury deliberations is unsupported by any case law, cf. Shafer, 532 U.S. at 51 n.5 ("If the jurors should be told life means no parole in the hypothesized bifurcated sentencing proceeding, they should be equally well informed in the actual uninterrupted proceeding."), and precludes the jury from revisiting earlier findings or beginning the deliberative process anew at any time.  The judge's response to the jury's inquiry, just like a juror's change of heart, may shake views previously voiced.  At all times during the collective process, without violating the jury instructions, jurors remain

- 29 -

free to reconsider previous votes and express a change of mind. See United States v. Rastelli, 870 F.2d 822, 834 (2d Cir. 1989) ("[I]t is well established that the jury's verdict is not final until the 'deliberations are over, the result is announced in open court, and no dissent by a juror is registered.'" (quoting United States v. Taylor, 507 F.2d 166, 168 (5th Cir. 1975)); Taylor, 507 F.2d at 168 ("Jurors are not bound by votes in the jury room and remain free to register dissent even after the verdict has been announced, though before the verdict is recorded."); see also United States v. Chinchic, 655 F.2d 547, 549-50 (4th Cir. 1981) ("Votes taken in the jury room prior to being returned in open court are merely preliminary and are not binding on the jury, any member of which is entitled to change his or her mind up until the time of the trial court's acceptance of the verdict.").

Third, the dissent's contrast between the broad discretion of South Carolina's juries and "the narrowly circumscribed" responsibilities of their Oklahoma counterparts "to determin[e] whether the aggravating circumstance(s) proved by the prosecution beyond a reasonable doubt outweigh the defendant's evidence in mitigation," is misguided. Dissent at 8. If the dissent's construction of Oklahoma law were correct, then a jury would be compelled to impose the death penalty when it found that the aggravating circumstances outweighed the mitigating circumstances. In fact, the Oklahoma Court of Criminal Appeals and the Tenth Circuit have repeatedly held the opposite to be true. Under Oklahoma law, "[a] life sentence may be given even if the jury finds aggravating circumstances outweigh mitigating circumstances." Le v. State, 947 P.2d 535, 554 n.61

(Okla. Crim. App. 1997); Bryan v. State, 935 P.2d 338, 364 (Okla. Crim. App. 1997) ("As this Court has often held, a life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances.") (citing cases); see also LaFevers v. Gibson, 182 F.3d 705, 718 (10th Cir. 1999) ("Under Oklahoma law, a jury is free to decline to impose the death penalty even if it finds that the aggravating circumstances outweigh the mitigating circumstances."); DuVall v. Reynolds, 139 F.3d 768, 789-90 (10th Cir. 1998) (same); Parks v. Brown, 860 F.2d 1545, 1563 (10th Cir. 1998) (en banc) ("In the sentencing process, the determination of the number and seriousness of aggravating circumstances is merely a guideline for the jurors, a benchmark for considering the death penalty. If the jury finds that aggravating circumstances outweigh mitigating circumstances, imposition of the death penalty is constitutionally permissible; however, under Oklahoma law, the jury may still exercise its discretion by refusing to impose the death penalty.") (emphasis added), rev'd on other grounds by Saffle v. Parks, 494 U.S. 484 (1990).[5] Thus, even though Oklahoma retains a weighing-

_____

[5] Oklahoma's Uniform Jury Instructions also restate this proposition:

> OUJI-CR 4-80. Death Penalty Proceedings--Weighing Aggravating And Mitigating Circumstances
> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), you may impose a

based death penalty scheme, the discretion vested in its juries regarding the imposition of the death penalty is similar to that of the South Carolina juries whose deliberations were directly at issue in Simmons and Shafer. See Johnson v. State, 731 P.2d 993, 1003 (Okla. Crim. App. 1987) (interpreting instruction that stated the jury "'could be authorized to consider imposing a sentence of death' if an aggravating circumstance were found" as subsuming "[t]he idea that the idea that the jury may decline to impose the death penalty even if aggravating circumstances are not outweighed by mitigating circumstances"), overruled on other grounds by Green v. State, 862 P.2d 1271 (Okla. Crim. App. 1993).

Fourth, the dissent's suggestion that, once rejected as an aggravator, the question of future dangerousness "cannot affect the jury's moral judgment during the weighing of aggravating and mitigating circumstances," Dissent at 12, unsoundly limits the evidence that may be properly considered. In spite of the jury's failure to find the continuing threat aggravator beyond a reasonable doubt, the jury is entitled to "consider all evidence presented throughout the trial in determining what sentence the defendant should receive." Parks v. State, 651 P.2d at 694 (citing Lockett v. Ohio, 438 U.S. 586, 606 (1978)) (emphasis supplied); see also Trial Trans. vol. VII, at 66-71 (prosecutor's closing

---

> sentence of imprisonment for life with the possibility of parole
> or imprisonment for life without the possibility of parole.

OUJI-CR (2d) 4-80 (emphasis added); see McGregor v. State, 885 P.2d 1366, 1384 (Okla. Crim. App. 1994) ("A life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances, but an instruction on this point is not required.").

argument) (noting that "[a]ll evidence from the first stage has been introduced into this stage"). "[T]he sentence imposed at the penalty stage should reflect a reasoned <u>moral</u> response to the defendant's background, character, and crime." <u>California v. Brown</u>, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). "[T]o attempt to separate the sentencer's decision from his experiences would inevitably do precisely that. It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing." <u>Barclay v. Florida</u>, 463 U.S. 939, 950 (1983).

Thus we cannot know the extent to which the prosecution's evidence and argument regarding Mr. Mollett's future dangerousness influenced the jury's conclusion that a particular mitigating circumstance, such as the defendant's generousness, gentle manner, caring and loving nature, and other compassionate qualities, did not outweigh the other aggravators. <u>See</u> Jury Instruction 51 (listing mitigating circumstances). Nor can we know how the jury reached this conclusion, and for good reason. <u>See</u> <u>Barclay</u>, 463 U.S. at 950 ("It is neither possible nor desirable for a person to whom the state entrusts [such] an important judgment to decide in a vacuum.").

Finally, we are in no way suggesting that the jury may disregard the judge's instructions regarding aggravating and mitigating circumstances. We have not "effectively converted Oklahoma into a nonweighing state." Dissent at 22. Oklahoma retains a weighing-based scheme that requires that the jury "unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt" before it is "authorized to

consider imposing a sentence of death." Jury Instruction 49; Okla. Stat. tit. 21, § 701.11.

On the contrary, we are merely recognizing that, at sentencing, juries are free to consider all "constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990); see also Parks, 651 P.2d at 694 (noting that the Supreme Court in Lockett v. Ohio, 438 U.S. at 606, "authorized the sentencer, in this case the jury, to consider not only the defendant's record and character, but any circumstances of the offense").

### 4. Should this court *sua sponte* reach the issue of harmless error?

The State of Oklahoma wholly failed to argue on appeal that the trial court's instruction, if erroneous, should nonetheless be affirmed as harmless error. However, "'we may exercise our discretion to initiate harmless error review in an appropriate case.'" United States v. Samaniego, 187 F.3d 1222, 1224 (10th Cir. 1999) (quoting United States v. Torrez-Ortega, 184 F.3d 1128, 1136 (10th Cir. 1999)) (emphasis supplied). In considering whether to do so, we have "cited with approval three factors suggested by the Seventh Circuit in determining whether an appellate court should address harmlessness when the government has failed to do so: (1) the length and complexity of the record; (2) whether the harmlessness of the errors is certain or debatable; and (3) whether a reversal would result in protracted, costly, and futile proceedings." Samaniego, 187 F.3d at 1225 (citing Torrez-Ortega, 184 F.3d at 136, in turn citing United States v. Giovanneti, 928 F.2d 225, 227 (7th Cir. 1991)). However, "confusion about what the third factor contributes to

the analysis has caused this and other courts to merely reference [the third factor] but not apply it." Samaniego, 187 F.3d at 1225 n.2.

Applying the first two factors then, we do not consider this to be an appropriate case for us to conduct a full-bore harmless error review "unassisted by briefing by the parties or consideration by the district court," which did not in this case perform a harmless error analysis on the Simmons claim. Cook v. McKune, 323 F.3d 825, 840 n.9 (10th Cir. 2003). First, the record is lengthy and somewhat complex: the record is several thousand pages and covers a seven-day trial, including the government's case against Mr. Mollett, which involved proving two crimes and then in a separate sentencing phase attempting to prove three different mitigating factors to convince the jury to impose the death penalty.

Second, and more importantly, the harmlessness of the Simmons error is "at best debatable." Torrez-Ortega, 184 F.3d at 1136. In harmless error analysis in a capital case, we are mindful of the "need for heightened reliability in determining a capital sentence." Johnson, 254 F.3d at 1155. See also Gardner v. Florida, 430 U.S. 349, 357-58 (1977) ("From the point of view of society, the action of the sovereign in taking the life of one of its citizens . . . differs dramatically from any other legitimate state action"); Andres v. United States, 333 U.S. 740, 752 (1948) ("In death cases, doubts with regard to the prejudicial effect of trial error should be resolved in favor of the accused."); Andrews v. Shulsen, 802 F.3d 1256, 1263-64 (10th Cir. 1986) ("[B]ecause there is a qualitative

difference between death and any other permissible form of punishment, 'there is a corresponding <u>difference in the need for reliability</u> in the determination that death is the appropriate punishment in a specific case.'") (quoting <u>Zant v. Stephens</u>, 462 U.S. 862, 864 (1982), in turn quoting <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976) (plurality opinion of Stewart, Powell, and Stevens, JJ.)) (emphasis supplied). With that critical need for reliability in mind, and assuming that harmless error analysis is applicable to a <u>Simmons</u> violation,[6] the question of whether the <u>Simmons</u> error in Mr. Mollett's case was harmful is "debatable" in two respects.

First, when the jury, having found the two aggravators proven beyond a reasonable doubt, engaged in the required determination of whether to impose the death penalty based on, for each of aggravators, whether the "aggravating circumstance is outweighed by the finding of one or more mitigating circumstances," Okla. Stat. tit. 21, § 701.11, the jury's confusion about parole could well have influenced its verdict of death. Justice O'Connor in <u>Simmons</u> observed that the fact "that the jury in this case felt compelled to ask whether

_____

[6] It is not entirely clear whether a <u>Simmons</u> error is subject to harmless error analysis, nor have the parties' briefs addressed this issue. On the one hand, the Supreme Court has stated that "[m]ost constitutional errors can be harmless," <u>Neder v. United States</u>, 527 U.S. 1, 8 (1999) (internal quotation mark omitted), and that "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." <u>Id.</u> (quotation marks omitted). On the other hand, the Supreme Court has never performed a harmless error analysis in any of the three cases where the Court found a <u>Simmons</u> violation: neither in <u>Simmons</u> nor <u>Shafer</u>, nor in <u>Kelly v. South Carolina</u>, 534 U.S. at 254 n.4, a more recent case in which the Supreme Court reversed a state court on <u>Simmons</u> grounds, did the Court engage in harmless error analysis, let alone hold that the error was harmless.

parole was available shows that the jurors did not know whether or not a life-sentenced defendant will be released from prison." Simmons, 512 U.S. at 177-78 (O'Connor, J., concurring). In holding that the defendant's due process rights were violated, Justice O'Connor stated that "the prosecutor, by referring to a verdict of death as an act of 'self-defense,' strongly implied that petitioner *would* be let out eventually if the jury did not recommend a death sentence." Id. (emphasis in original).

Similarly, the combination in Mr. Mollett's case of the prosecutor's focus on Mr. Mollett's future dangerousness and the jury's subsequent question to the trial judge directly implicates, and leaves unresolved in this case, the concerns articulated in Justice O'Connor's opinion for the court in Simmons. In Mr. Mollett's trial, the prosecutor, in closing argument on rebuttal, stated that "[t]hey say prison is good enough, he can't get out," Tr. Trans. vol. VII, at 80, that "[t]he people he meets there, the people he influences there, the people in contact with that mind there, they'll come out," id., that "[n]ot everyone in prison's [sic] in there forever," id. and, in his summation, warned the jury that "the cycle beings again." Id. In the wake of this closing argument, the trial judge responded to the jury's query by saying "[m]atters of parole are beyond the purvue [sic] of the jury or the court to consider," and by refusing to permit Mr. Mollett to introduce evidence demonstrating that he was ineligible for parole. The trial judge's responses, which violated Mr. Mollett's due process rights under Simmons, left the prosecutor's warning about the danger of Mr. Mollett emerging from prison front and center for the

- 37 -

jury to consider in its deliberations on whether to sentence Mr. Mollett to death.

Second, the trial court's erroneous instruction may have made the jurors more likely to find the two aggravators charged in addition to continuing threat satisfied if the jurors were under the impression that *both* of the sentencing options involving life imprisonment involved the possibility of future parole, a point of confusion reflected in the jury's question to the trial judge. Indeed, counsel for the State conceded at oral argument that at least some of the continuing threat evidence was relevant to the two aggravators found by the jury: that the murder was "especially heinous, atrocious or cruel," and that Mr. Mollett committed the murder "to avoid lawful arrest or prosecution." Okla. Stat. tit. 21, § 701.12. Neither in the State's briefs, nor in its answers to our questions at oral argument, nor in our independent record review, have we discovered any evidence indicating that the jury found the two non-continuing threat aggravators prior to finding that the State had not proven the continuing threat aggravator. Although the jury decided that the continuing threat aggravator was not proved beyond a reasonable doubt, the jury may well have nonetheless considered continuing threat evidence in the deliberations over to what ultimate penalty to impose after it found the other two aggravators beyond a reasonable doubt: in capital cases, "the consequences of failure [are] so vital . . . that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. 123, 135 (1968), quoted in Simmons, 512 U.S. at 171 (plurality).

Given these two concerns about the potential harm of the Simmons error, given the

"need for heightened reliability in determining a capital sentence," <u>Johnson</u>, 254 F.3d at 1166, and given that we are "loath," <u>Mayes v. Gibson</u>, 210 F.3d 1284, 1291 (10th Cir. 2000), "to speculate on the deliberative process of a jury," <u>id.</u>, we do not find it appropriate to relieve the government of the consequences of its failure to argue harmless error. We therefore decline to *sua sponte* reach the merits of the harmless error issue.

### III. CONCLUSION

In closing, we emphasize the narrowness of this holding: in a case where all of the <u>Simmons</u> factors are aligned–that is, (1) a capital case where (2) the prosecution places future dangerousness at issue through the charging of a continuing threat aggravator; and (3) the jury requests an explanation of the definition of life imprisonment, and (4) the judge's response creates a false choice – and where, as here, there was no opportunity to cure the confusion because counsel were not informed of the question, a defendant is entitled to relief. For the reasons detailed above, we conclude that the Oklahoma trial court "misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced," <u>Wiggins</u>, 123 S. Ct. at 2535 (internal quotation marks omitted), and that the trial court's error was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The federal district court

- 39 -

therefore correctly granted habeas relief on Mr. Mollett's due process claim. Consequently, we need not discuss the arguments concerning ineffective assistance of counsel. <u>See, e.g.</u>, <u>Scott v. Mullin</u>, 303 F.3d 1222, 1232 (10th Cir. 2002). The district court's conditional grant of Mr. Mollett's 28 U.S.C. § 2254 petition for habeas corpus, including its finding that Mr. Mollett is "entitled to a new sentencing hearing," <u>id.</u>, is **AFFIRMED**.

No. 01-6403, *Mollett v. Mullin*

**MURPHY**, Circuit Judge, dissenting.

This case presents an important question: Do the Supreme Court's decisions in *Simmons* and *Shafer* apply in a state with a weighing-based death penalty scheme when the jury has determined that the prosecution failed to prove beyond a reasonable doubt that the defendant is a continuing threat to society? The answer to that question is "no." The majority erroneously concludes, however, that Mollett's jury was presented with the same due process problem at issue in *Simmons*. Majority Op. at 16-36. The majority's opinion is based on a faulty application of *Simmons* and *Shafer* and a concomitant failure to consider key differences between the nonweighing-based death penalty scheme in South Carolina and the weighing-based death penalty scheme in Oklahoma.

The majority sets out at great length the Supreme Court's holdings in *Simmons v. South Carolina*, 512 U.S. 154 (1994) and *Shafer v. South Carolina*, 532 U.S. 36 (2001). Majority Op. 16-23. I do not quibble with the rule of law the majority draws from these cases: "Reaffirming its holding in <u>Simmons</u>, the Court held [in *Shafer*] 'that <u>whenever future dangerousness is at issue in a capital sentencing proceeding</u> under South Carolina's new scheme, <u>due process requires that the jury be informed that a life sentence carries no possibility of parole</u>.'" Majority Op. at 21 (quoting *Shafer*, 532 U.S. at 51 (emphasis added in Majority Op.)). The majority fails to acknowledge, however, that the Supreme Court's ruling was specifically in response to South Carolina's nonweighing-based death

penalty scheme.[1]  An understanding of the way in which the South Carolina death penalty scheme operates is essential to understanding the exact parameters of the rule announced in *Simmons*.

South Carolina is what is commonly referred to as a "nonweighing state."  *See* S.C. Code Ann. § 16-3-20; *Jones v. State*, 504 S.E.2d 822, 824 n.1 (S.C. 1998); *see also Smith v. Moore*, 137 F.3d 808, 815 (4th Cir. 1998).  *See generally Stringer v. Black*, 503 U.S. 222, 229-30 (1992) (describing, by reference to Mississippi's and Georgia's death penalty schemes, differences between weighing and nonweighing states).  In South Carolina, the jury must find the existence of at least one statutory aggravating circumstance before a defendant is eligible for a sentence of death.  S.C. Code Ann. § 16-3-20(B).  If the jury finds the existence of a statutory aggravating circumstance, it must move on to determine whether to impose the death sentence.  *Id.*  In so doing, the jury is not limited to a "weighing" of the aggravating circumstances proved by the state against any mitigating circumstances proved by the defendant.  *Id.*  Instead, the jury's prerogatives are much broader: it is entitled to consider "additional evidence in extenuation, mitigation, or aggravation of the punishment."  *Id.*  A South Carolina jury is not inhibited by a requirement that it limit its deliberations to weighing of statutory aggravators and mitigating circumstances, as is the jury in a weighing state like Oklahoma.

---

[1]It must be noted that the only material quoted from *Shafer* that the majority did not emphasize is the language indicating that the Court was announcing its rule with regard to "'South Carolina's new scheme.'" Majority Op. at 21 (quoting *Shafer*, 532 U.S. at 51).

Under South Carolina's death penalty scheme, future dangerousness is not a statutory aggravating circumstance to be considered in the death eligibility step of jury deliberations. *Kelly v. South Carolina*, 534 U.S. 246, 259 n.* (2002) (Rehnquist, C.J., dissenting). Nevertheless, once a jury finds the existence of at least one of the requisite statutory aggravators and proceeds to the imposition step of its deliberations, "it may consider future dangerousness in determining what sentence to impose." *Id.* at 260 (Rehnquist, C.J., dissenting). This is so because under the South Carolina scheme the decision whether to impose a sentence of death is made after a consideration of the specific circumstances of the crime and all of the characteristics of the offender; the universe of appropriate considerations at this stage of the sentencing determination is unconstrained by the enumerated statutory aggravating circumstances. *See State v. Owens*, 552 S.E.2d 745, 760 (S.C. 2001); *Jones*, 504 S.E.2d at 824 n.1; *see also Simmons*, 512 U.S. at 162-63 (plurality opinion) (noting that under South Carolina's death penalty scheme "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury is then free to consider a myriad of factors to determine whether death is the appropriate punishment" (quotation omitted) (alteration in original)). At this stage of the proceedings, a South Carolina jury is free to reject the death penalty "for any reason or no reason at all." *Shafer*, 532 U.S. at 50-51.

The Court's decisions in *Simmons* and *Shafer* cannot be unhinged from this specific state statutory backdrop. *Shafer* makes this clear. In that case, South Carolina argued that *Simmons* no longer applied because it had adopted a new tripartite sentencing option in capital cases. *Shafer*, 532 U.S. at 49-50. In rejecting this argument, the Court concluded as follows:

> At the time the trial judge instructed the jury in Shafer's case, it was indeed possible that Shafer would receive a sentence other than death or life without the possibility of parole. That is so because South Carolina, in line with other States, gives capital juries, at the penalty phase, discrete and sequential functions. Initially, capital juries serve as factfinders in determining whether an alleged aggravating circumstance exists. Once that factual threshold is passed, the jurors exercise discretion in determining the punishment that ought to be imposed. The trial judge in Shafer's case recognized the critical difference in the two functions. He charged that "[a] statutory aggravating circumstance is a fact, an incident, a detail or an occurrence," the existence of which must be found beyond a reasonable doubt. Turning to the sentencing choice, he referred to considerations of "fairness and mercy," and the defendant's "moral culpability." He also instructed that the jury was free to decide "whether . . . for any reason or no reason at all Mr. Shafer should be sentenced to life imprisonment rather than to death."
>
> In sum, when the jury determines the existence of a statutory aggravator, a tightly circumscribed factual inquiry, none of *Simmons'* due process concerns arise. There are no "misunderstanding[s]" to avoid, no "false choice[s]" to guard against. *See Simmons*, 512 U.S. at 161 (plurality opinion). The jury, as aggravating circumstance factfinder, exercises no sentencing discretion itself. If no aggravator is found, the judge takes over and has sole authority to impose the mandatory minimum so heavily relied upon by the South Carolina Supreme Court. It is only when the jury endeavors the moral judgment whether to impose the death penalty that parole eligibility may become critical. Correspondingly, it is only at that stage that *Simmons* comes into play, a stage at which South Carolina law provides no third choice, no 30-year mandatory minimum, just death or life without parole. We therefore hold that whenever future dangerousness is at issue in a capital sentencing proceeding *under South Carolina's new scheme*,

-4-

due process requires that the jury be informed that a life sentence carries no possibility of parole.

*Id.* at 50-51 (citations and footnote omitted) (emphasis added) (alterations in original).

Accordingly, what was at issue in *Simmons* and *Shafer* was that step in jury deliberations on sentencing in South Carolina at which the jury exercises its unfettered moral judgment to determine whether the defendant should be sentenced to either life imprisonment or death. The Court was unequivocal that South Carolina could not skew that particular process by preventing a capital defendant from presenting truthful information, either through argument or instruction, of parole ineligibility when the state raises the issue of future dangerousness. *See Simmons*, 512 U.S. at 175 (O'Connor, J., concurring in the judgment) ("Capital sentencing proceedings must of course satisfy the dictates of the Due Process Clause, and one of the hallmarks of due process in our adversary system is the defendant's ability to meet the State's case against him." (citation and quotation omitted)); *id.* at 177 (O'Connor, J., concurring in the judgment) ("When the State seeks to show the defendant's future dangerousness, however, the fact that he will never be released from prison will often be the only way that a violent criminal can successfully rebut the State's case.").[2]

_____

[2]In a portion of the majority opinion purportedly declining to address the issue of harmless error, the majority notes that the Supreme Court has never performed a harmless error analysis after having found a *Simmons* error. *See* Majority Op. at 39 n.6. Because, as set out below, a *Simmons* error did not occur in this case, it is unnecessary to address the question whether a *Simmons* error is subject to harmless error review. In light of the nature of the due process problem identified in *Simmons*, however, it is not surprising that the Court has never subjected such an error to a harmless-error analysis. As noted above,

The rule announced in *Simmons* and *Shafer*, however, is not applicable to Oklahoma's death penalty scheme unless the jury specifically finds during the eligibility step in deliberations that a defendant is a continuing threat to society, a statutory aggravating circumstance to be weighed against any mitigating circumstances during the imposition step of deliberations. Unlike South Carolina, Oklahoma is a weighing state. *See Duckett v. Mullin*, 306 F.3d 982, 1001 n.9 (10th Cir. 2002). The eligibility step of jury deliberations in Oklahoma is much like the eligibility step in South Carolina. Oklahoma juries have three sentencing options upon finding a defendant guilty of first degree

---

*Simmons* and *Shafer* are narrowly focused on the presentation of a "false choice" to the jury during that step in deliberations when the jury is to exercise its unfettered moral judgment in deciding whether to impose a death sentence. Furthermore, the Court has recognized that truthful information regarding parole ineligibility is often "the only way that a violent criminal can successfully rebut the State's" assertion of future dangerousness. *Simmons v. South Carolina*, 512 U.S. 154, 177 (1994) (O'Connor, J., concurring in the judgment). In these circumstances, it is hard to see how a true *Simmons* error could ever be harmless.

The problem in this case, as explicated below, is that the majority has expanded what constitutes a *Simmons* error well beyond the context of the decisions in *Simmons* and *Shafer*. As a consequence, in this circuit, *Simmons* errors will now comprise not only a false choice regarding future dangerousness during the unfettered moral-judgment stage of a nonweighing death penalty proceeding, but also a false choice during the imposition step in a death penalty proceeding in a weighing state like Oklahoma, despite a jury finding that the defendant was not a continuing threat to society. *Simmons* and *Shafer* simply do not speak to the particular circumstances of this case. Nor do *Simmons* and *Shafer* speak to the question whether the error that occurred in this case is harmless. *See infra.*

-6-

murder: death, life imprisonment without the possibility of parole, or life imprisonment. Okla. Stat. Ann. tit. 21, § 701.9(A).[3] A death sentence is not appropriate, however, unless the jury finds that the prosecution proved beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. *Id.* § 701.11. Unlike in South Carolina, however, future dangerousness is a statutory aggravating circumstance in Oklahoma. *Id.* § 701.12(7).

If the jury finds the existence of a statutory aggravating circumstance, it moves on to the actual sentencing decision, the imposition step. The process an Oklahoma jury utilizes to arrive at its ultimate sentencing determination is vastly different from the system employed in South Carolina. In Oklahoma, the jury's task at this stage is more limited than in South Carolina. An Oklahoma jury is to determine whether all of the statutory aggravating circumstances proved by the prosecution beyond a reasonable doubt outweigh any mitigating circumstances proved by the defendant. *Id.* § 701.11 ("Unless at least one of the statutory aggravating circumstances enumerated in this act is [found beyond a reasonable doubt] or if it is found that *any such aggravating circumstance* is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed." (emphasis added)). Mollett's jury was so instructed. *See* Jury Instruction 52

---

[3]This court has held that instructing on these three options, without elaboration, satisfies *Simmons*. *Johnson v. Gibson*, 254 F.3d 1155, 1165 (10th Cir. 2001). Furthermore, in response to an inquiry by the jury as to the meaning of life imprisonment without the possibility of parole, the trial court may simply refer the jury back to the instructions given. *Id.*

("If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that *any such aggravating circumstance or circumstances* outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed." (emphasis added)). Accordingly, unlike the open-ended imposition step in deliberations in South Carolina, where the jury is free to consider matters in aggravation not set out in the list of statutory aggravating circumstances, the jury's task in Oklahoma is narrowly circumscribed to determining whether the aggravating circumstance(s) proved by the prosecution beyond a reasonable doubt outweigh the defendant's evidence in mitigation. Okla. Stat. Ann. tit. 21, § 701.11; *Irvin v. State*, 617 P.2d 588, 598 (Okla. Crim. App. 1980).

Although South Carolina is a nonweighing state and Oklahoma is a weighing state, both require the jury to exercise its moral judgment to determine what is the appropriate penalty. The information the jury can consider in the two states in reaching that moral judgment is, however, vastly different. Mollett's jury was instructed to undertake a weighing of the aggravating circumstances proved by the prosecution against the mitigating circumstances proved by Mollett; it was not allowed to utilize any other aggravating circumstances in arriving at its sentence. Having previously concluded that the prosecution failed to prove that Mollett was a continuing threat to society, future dangerousness was not at issue at the imposition step in the jury deliberations in Mollett's

-8-

sentencing proceeding.[4]  Because, as noted above, *Simmons* was clearly focused on the

---

[4]In the process of declining to decide whether the purported *Simmons* violation in this case was harmless, the majority asserts as follows: (1) the trial judge's response to the jury's question about parole eligibility "left the prosecutor's warning about the danger of Mr. Mollett emerging from prison front and center for the jury to consider in its deliberations on whether to sentence Mr. Mollett to death," Majority Op. at 40; and (2) the trial court's erroneous instruction made it more likely that the jury found the existence of the other two aggravating circumstances alleged by the prosecution in this case, *id.* at 41.  These assertions demonstrate a fundamental misapplication of Oklahoma's death penalty system.

The prosecutor's warnings about the danger of Mollett emerging from prison simply do not relate in any way to the questions whether the murder was "especially heinous, atrocious, or cruel," or whether the murder was committed "to avoid lawful arrest or prosecution."  Instead, the prosecutor's arguments are relevant only to the factual question whether Mollett was likely to be a continuing threat to society at large.  The jury concluded, as a matter of fact, that the prosecution had not proved Mollett would be a future danger to society at large.  Having so concluded, the jury was instructed that the question of future dangerousness was to play no further role in its deliberations.  *See* Jury Instruction 52 ("If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that *any such aggravating circumstance or circumstances* outweighs the finding of one or more mitigating circumstances, the death penalty shall not be imposed." (emphasis added)).  The majority's assertion that the jury continued to consider the issue at the imposition step of its deliberations ignores the strong presumption that juries act in accord with their instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

More importantly, the majority's musings about potential harm in this case threaten to convert *Simmons* into an almost limitless truth-in-sentencing case.  The majority seems to assert that *Simmons* is implicated in this case because "at least some of the continuing threat evidence was relevant to the two aggravators found by the jury." Majority Op. at 41.  It is certainly true that evidence relating to the brutal nature of a murder is potentially relevant to both the heinous, atrocious, or cruel and continuing threat aggravating circumstances.  *See Murphy v. State*, 47 P.3d 876, 887-88 (Okla. Crim. App. 2002) (relying in part on brutal nature of the crime in concluding that sufficient evidence supported the continuing threat aggravating circumstance).  Under the majority's theory, however, a defendant in Oklahoma would be entitled to a jury instruction about parole eligibility even if the prosecution did not allege the continuing threat aggravating circumstances, so long as any of the evidence adduced in support of any other aggravating circumstance might also be relevant to future dangerousness.  Unlike the majority, the Supreme Court does not read its opinion in *Simmons* as

-9-

presentation of a false choice to the jury at the imposition step, thereby skewing the jury's moral judgment, *Simmons* simply does not speak to the circumstances of this case. *See Shafer*, 532 U.S. at 51 ("[W]hen the jury determines the existence of a statutory aggravator, a tightly circumscribed factual inquiry, none of *Simmons*' due process concerns arise. . . . The jury, as aggravating circumstance factfinder, exercises no sentencing discretion itself. . . . *It is only when the jury endeavors the moral judgment whether to impose the death penalty that parole eligibility may become critical*." (emphasis added)).[5]

Although no *Simmons* violation occurred in this case because the matter of future dangerousness was not considered during the weighing or imposition step in the jury deliberations, the jury was nevertheless presented with an incomplete picture when the

---

establishing such a broad rule. *See Kelly v. South Carolina*, 534 U.S. 246, 254 n.4 (2002) (noting that the Court had not yet decided this question). Thus, the majority appears to be creating a new, substantive rule of criminal procedure, rather than simply applying *Simmons*. In such a circumstance, a *Teague v. Lane*, 489 U.S. 288 (1989), analysis is necessary.

[5]This court's decision in *Johnson* is not to the contrary. In *Johnson*, the jury was improperly instructed about parole eligibility and thereafter found that the continuing threat aggravator was proved beyond a reasonable doubt. 254 F.3d at 1164-65, 1159. Accordingly, at the imposition step in deliberations, the jury considered the fact that the defendant was a future danger to society, including its misconception about the defendant's parole eligibility, in exercising its moral judgment as to whether the aggravating circumstances outweighed the mitigating circumstances. I certainly agree that a *Simmons* violation occurred under those circumstances. In this case, on the other hand, when the jury concluded that Mollett was not a continuing threat to society, the matter dropped out of consideration, leaving the jury to weigh only the heinous nature of the crime and the murder-committed-to-avoid-prosecution aggravator against Mollett's evidence in mitigation.

-10-

trial court instructed it that the matter of parole eligibility was beyond its purview. As a consequence, in deciding the factual question of whether Mollett was a continuing threat to society, the jury was denied key information regarding the possibility of Mollett's future release from prison. This independent due process violation, however, occurred at the eligibility step, rather than the imposition step in deliberations. This distinction is not academic. A *Simmons* violation occurs, if at all, only at the imposition step in jury deliberations, a step when the jury is exercising its unfettered moral judgment as to an appropriate punishment.[6] *See id.* For those reasons set out above, *see supra* note 2, it is virtually impossible to determine whether such an error is harmless. When a due process error involving false choice occurs at the eligibility step in deliberations in Oklahoma, however, the error is necessarily harmless if the jury ultimately rejects the continuing threat aggravator. At that point, it is clear that the error did not affect the jury's eligibility determination. Because Oklahoma is a weighing state, the matter then drops out of consideration, and cannot affect the jury's moral judgment during the weighing of aggravating and mitigating circumstances, the imposition step in Oklahoma.

---

[6]In both a weighing state and nonweighing state, the jury is necessarily exercising its moral judgment during the imposition step of deliberations, the only difference being how or if the jury's discretion is channeled or limited. As set out above, at the imposition step in South Carolina, the jury is free to consider all evidence bearing on the circumstances of the murder and the defendant's character. In Oklahoma, however, the jury is to weigh only those aggravating circumstances proved by the prosecution beyond a reasonable doubt against the defendant's evidence in mitigation.

The majority asserts that this dissent is built on faulty logic. In particular, the majority asserts as follows: (1) the dissent fails to recognize that *Simmons* and its progeny apply to Oklahoma's death penalty scheme and "ignores the clear language of the Simmons line of cases that it is the prosecution's placing the defendant's future dangerousness at issue that potentially creates the 'false choice,'" Majority Op. at 30-31; (2) the dissent unduly compartmentalizes the eligibility and imposition steps of jury deliberation in analyzing whether a *Simmons* violation occurred in this case, *id.* at 31-33; (3) the Oklahoma and South Carolina death penalty scheme are more alike than the dissent recognizes, *id.* at 32-34; and (4) the approach adopted by the dissent "unsoundly limits the evidence that may be properly considered" by the jury, *id.* at 34-36. As set out below, none of the majority's criticisms of this dissenting opinion are convincing.

Citing to the Oklahoma Court of Criminal Appeals' opinion in *Williams v. State*, 31 P.3d 1046, 1050 (Okla. Crim. App. 2001) ("*Williams I*"), the majority simply asserts that "there is no question that Simmons and its progeny apply to Oklahoma's [death penalty] scheme." Majority Op. at 30. *Williams I*, however, does not speak to the circumstances of this case. As was the case in this court's decision in *Johnson*, 254 F.3d at 1164-66, the *Williams I* jury specifically found that the defendant was a continuing threat to society. *Williams v. State*, 22 P.3d 702, 732 (Okla. Crim. App. 2002). For exactly those reasons set out above in discussing *Johnson*, *see supra* note 5, *Williams I* does not compel the conclusion that *Simmons* and its progeny are implicated by the circumstances of this case.

-12-

The majority further asserts that this dissent "ignores the clear language of every Simmons case that it is the prosecution's placing the defendant's future dangerousness at issue that potentially creates the 'false choice.'" Majority Op. at 30. As set out above, however, each of the cases in the *Simmons* line deals with the nonweighing death penalty system in South Carolina. Unlike the situation in *Simmons*, *Shafer*, and *Kelly*, the jury here specifically found that the prosecution had failed to prove, under the requisite standard, that Mollett was a continuing threat to society. The jury was thus precluded from considering the matter during its deliberations on whether to impose the death penalty. For just this reason, the majority is wrong in asserting that *Simmons* applies in exactly the same way to both South Carolina's nonweighing death penalty scheme and Oklahoma's weighing death penalty scheme. *See* Majority Op. at 31.

The majority next complains that "the dissent's rigid division of the jury's deliberations into an 'eligibility step' and an 'imposition step' misreads Simmons and Shafer." Majority Op. at 31.[7] According to the majority, when the jury asked about the meaning of life without parole, it was possible that the jury "had proceeded to weighing

_____

[7]This dissent assumes that the majority does not take issue with the two-step process in jury deliberations: the eligibility step and the imposition step. These steps are real and were specifically acknowledged in *Shafer*:

> South Carolina, in line with other States, gives capital juries, at the penalty phase, discrete and sequential functions. Initially, capital juries serve as factfinders in determining whether an alleged aggravating circumstance exists. Once that factual threshold is passed, the jurors exercise discretion in determining the punishment that ought to be imposed. The trial judge in Shafer's case recognized the critical difference in the two functions.

532 U.S. at 50.

-13-

aggravating and mitigating circumstances to determine if the death penalty was warranted." *Id.* Such a state of affairs is possible, however, only if the jury disregarded its instructions. In Instruction 47, the jury was told that its first task during sentencing deliberations "was to determine whether at the time this crime was committed any one or more of the [specifically alleged] aggravating circumstances existed beyond a reasonable doubt." Instruction 49 informed the jury that "[a]ggravating circumstances are those which increase the guilt or enormity of the offense. In determining which sentence to impose in this case, you may only consider those aggravating circumstances set forth in these instructions." Instruction 49 further informed the jury that it was not empowered to consider a death sentence unless it unanimously found the existence beyond a reasonable doubt of at least one aggravating circumstance. Instructions 50 and 51 defined mitigating circumstances for the jury and set out a list of fourteen mitigating circumstances supported by Mollett's evidentiary submissions. Finally, Instruction 52 instructed the jury that if it found beyond a reasonable doubt the existence of at least one specifically charged aggravating circumstances, it must weigh only those particular aggravating circumstances proved beyond a reasonable doubt against any mitigating circumstances proved by Mollett; only if those aggravating circumstances outweighed Mollett's evidence in mitigation was the jury empowered to impose a death sentence.

As should be clear from this recitation, it is the jury instructions given in this case, rather than some artificial construct from this dissenting opinion, that delineated the steps

the jury was required to take during its sentencing deliberations and restricted the matters it could consider at each step of those deliberations. *See* Majority Op. at 31-32 (recognizing that "the jury here was required to determine the existence of the alleged aggravating factors before proceeding to the question of whether to impose the death penalty"). Despite these clear instructions, however, the majority posits that the jury may have sent out its question when it was undertaking the weighing process. *Id.* at 32 ("Thus, when the jury asked about the meaning of life without parole, the judge did not know whether the jury was still debating the existence of the continuing threat and other aggravators *or whether it had proceeded to weighing aggravating and mitigating circumstances to determine if the death penalty was warranted.*" (emphasis added)). Because the jury found the prosecution had not proved beyond a reasonable doubt that Mollett was a continuing threat to society, the only way the majority's supposition could be true is if the jury ignored the specific instruction that during the weighing process it was confined to matters in aggravation that the prosecution had proved beyond a reasonable doubt. As noted above, such a hypothesis flies in the face of the strong presumption that juries act in accord with their instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).[8]

_____

[8]Recognition that the jury instructions in this case, pursuant to Oklahoma law, directed the jury to analyze the propriety of imposing a death sentence by undertaking both an eligibility step and an imposition step during deliberations does not, as asserted by the majority, "preclude[] the jury from revisiting earlier findings or beginning the deliberative process anew at any time." Majority Op. at 32. If, at any point, the jury was dissatisfied with its deliberations, it could begin deliberations anew, *as long as it did so within the confines of the jury instructions*; there is nothing in this dissent that would lead to a contrary conclusion. In actuality, it is the majority that does damage to the Oklahoma

-15-

Next, the majority criticizes this dissent for failing to recognize that a jury in Oklahoma can decline to impose a death sentence even if it determines that the aggravating circumstances outweigh the mitigating circumstances. Majority Op. at 33-35. From this fact the majority makes the illogical leap to the conclusion that there are no legally significant differences between the Oklahoma and South Carolina death penalty schemes for purposes of *Simmons* and *Shafer*. *Id.* at 33-34. The problem with the majority's assertion, of course, is that it is not supported by a single citation to authority supporting the proposition that once an Oklahoma jury completes the weighing process it is thereafter free to consider the universe of possible aggravating circumstances in deciding whether to impose a death sentence. Certainly the majority cannot cite to any such instruction given to the jury in this case.[9] In fact, Mollett's jury was specifically

_____

death penalty scheme by continuing to assert that the jury in this case, in direct derogation of its instructions, was free to consider continuing threat evidence during the weighing process, despite having found that the prosecution had not proved the existence beyond a reasonable doubt of the continuing threat aggravator. Majority Op. at 32, 35-37.

What makes the majority's assertion particularly puzzling, however, is that Mollett's jury did not change its mind about the continuing threat aggravator. As clearly reflected in the special verdict form, the jury specifically found, *upon its oath*, that the prosecution had not proved that Mollett was a continuing threat to society. Unless the majority is implying that the special verdict form is not an accurate account of the jury's findings, an assertion utterly lacking in record support, it is unclear how the majority's arguments are even remotely implicated in this case.

[9]The current Oklahoma uniform jury instruction cited in the majority opinion, *see* Majority Op. at 34 n.5, certainly does not support this proposition. It does not indicate that the jury is free to consider any matter it wants in arriving at an appropriate sentence. Instead, it simply indicates that the jury is free to impose a life sentence even if it finds that the aggravating circumstances outweigh the mitigating circumstances. In any event, the uniform jury instruction referenced by the majority was not given to the jury in this

-16-

informed, in Instruction 49, that it was to "consider only those aggravating circumstances set forth in these instructions." Furthermore, as set out above, the jury was specifically instructed, in Instruction 52, that in deciding whether a death sentence is appropriate, it was to consider only those aggravating circumstances proved by the prosecution beyond a reasonable doubt. Accordingly, although the jury in this case had the power to decline to impose a death sentence even after finding the aggravating circumstances outweighed the mitigating circumstances, it could not have, acting consistently with its instructions, imposed the death penalty for the reason that Mollett was a continuing threat to society.

Finally, the majority asserts that the approach advocated in this dissent "unsoundly limits the evidence that may properly be considered" by the jury. Majority Op. at 35. According to the majority, the jury is entitled to consider, apparently without limitation, all evidence presented at trial in determining what sentence a defendant should receive. *Id.* at 35-37. This would include, according to the majority, continuing threat evidence despite the jury's determination that the prosecution did not prove beyond a reasonable doubt the existence of that aggravator. *Id.* In support of this assertion, the majority relies on *Parks v. State*, 651 P.2d 686, 694 (Okla. Crim. App. 1982), *Lockett v. Ohio*, 438 U.S. 586, 606 (1978), and Justice O'Connor's concurring opinion in *California v. Brown*, 479 U.S. 538, 545 (1987). None of these cases support the majority's broad assertion that Mollett's jury

---

case.

was empowered to consider continuing threat evidence during the imposition step of deliberations, after having rejected that aggravator at the eligibility step.

In *Parks*, the Oklahoma Court of Criminal Appeals rejected a challenge to a jury instruction which specifically incorporated into the sentencing stage of the trial all evidence presented during the guilt stage of the trial. 651 P.2d at 694. The court simply cited to *Lockett* and noted that in arriving at a sentence the jury was free to consider "not only the defendant's record and character, but any circumstances of the offense." *Id.* There is nothing in *Parks* to indicate, however, that the jury is free to consider this evidence outside of the context provided in the jury instructions on sentencing. As noted above, in this case the jury was specifically instructed not to consider Mollett's future dangerousness during the weighing stage of deliberations unless it first found the prosecution had proved the existence of the aggravator beyond a reasonable doubt. Because the jury ultimately found that the prosecution had not proved Mollett was a continuing threat, this court must presume that the jury followed its instructions and did not consider continuing threat evidence during its weighing process. *Angelone*, 528 U.S. at 234. *Parks* merely stands for the proposition that incorporation of guilt stage evidence into the sentencing stage, and the use of that evidence by both the prosecution and defense to make their case within the confines of the jury instructions, is in accord with the United States Constitution. *Parks* does not support the majority's view that the case somehow

-18-

withdraws jury instructions which prohibit the consideration of some of the incorporated evidence.

This view of *Parks* is confirmed by the Oklahoma Court of Criminal Appeals' exclusive reliance on *Lockett* in setting out this rule. In *Lockett*, the Supreme Court addressed the constitutionality of an Ohio death penalty scheme which seriously restricted the *mitigating* circumstances that a capital defendant could present at trial. 438 U.S. at 597 (plurality opinion). In striking down Ohio's system as unconstitutional, the court repeatedly noted that the fatal flaw in the system was that it limited the matters in *mitigation* which could be considered by the sentencer.[10] Because the Ohio system did not allow the jury to consider the characteristics of the defendant and the circumstances of the

---

[10]*Lockett v. Ohio*, 438 U.S. 586, 597 (1978) ("We find it necessary to consider only her contention that her death sentence is invalid because the statute under which it was imposed did not permit the sentencing judge to consider, as mitigating factors, her character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime."); *id.* at 604 ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (footnote omitted) (emphasis in original)); *id.* at 605 ("There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."); *id.* at 608 ("The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors.").

crime that were potentially *mitigating*, the Supreme Court concluded Ohio's system violated the Eighth and Fourteenth Amendments. *Id.* at 607-09.

Likewise, the question in *Brown* was whether an instruction informing the jury that it must not be swayed by sympathy for the defendant violated a capital defendant's Eighth Amendment right to present all "relevant *mitigating* evidence regarding his character or record and any of the circumstances of the offense." *Id.* at 541 (quotation omitted) (emphasis added); *see also id.* at 544 (O'Connor, J., concurring) ("The issue in this case is whether an instruction designed to satisfy the principle that capital sentencing decisions must not be made on the mere whim, but instead on clear and objective standards, violates the principle that the sentencing body is to consider any relevant mitigating evidence."). Accordingly, when both the *Brown* majority and Justice O'Connor discuss the need for the jury's sentencing decision to be a reasoned moral response to the defendant's background, character, and crime, they are only discussing the defendant's Eighth Amendment right to present *mitigation* evidence.

Nothing in *Brown* or *Lockett* supports the notion that a state is precluded from designing its death penalty scheme to restrict *the matters in aggravation* that a jury can consider in deciding whether to impose a sentence of death. As demonstrated above, Oklahoma has done just that, mandating that juries not consider matters in aggravation in arriving at a sentencing decision unless the prosecution has proved the existence of those aggravating factors beyond a reasonable doubt. Okla. Stat. Ann. tit. 21, § 701.11. The

jury in this case was so instructed. The majority is simply wrong in asserting that system is in conflict with the Supreme Court's decision in *Lockett* or *Brown*.

The majority has effectively converted Oklahoma into a nonweighing state, thereby wiping away significant protections for capital defendants in Oklahoma. The majority has rewritten Oklahoma law so that juries are now free to consider, in arriving at an ultimate sentence, matters in aggravation not proved beyond a reasonable doubt by the prosecution. *See* Majority Op. at 34-36.

Moreover, the majority's assertions in this regard fundamentally misapply *Simmons*. As is made clear in Justice O'Connor's opinion concurring in the judgment in *Simmons*,[11] the rationale underlying the decision is narrowly directed to allowing a capital defendant to utilize the most powerful evidence available to overcome the prosecution's assertion that he is a continuing threat to society. *See* 512 U.S. at 177 (O'Connor, J., concurring in the judgment). According to Justice O'Connor,

> When the State seeks to show the defendant's future dangerousness . . . the fact that he will never be released from prison will often be the only way that a violent criminal can successfully rebut the State's case. I agree with the Court that in such a case the defendant should be allowed to bring his parole ineligibility to the jury's attention—by way of argument by defense counsel or an instruction from the court—as a means of responding to the State's showing of future dangerousness.

---

[11]"Justice O'Connor's three Justice concurrence [in *Simmons*] represented the narrowest grounds for a holding and, as such, represents the holding of the Court." *Smallwood v. Gibson*, 191 F.3d 1257, 1280 n.15 (10th Cir. 1999).

-21-

*Id.* (O'Connor, J., concurring in the judgment). As cogently noted by Justice O'Connor, a defendant's future parole status is clearly relevant to the question whether he is likely to be a future danger to society at large. The majority is misguided in asserting that there is a similar link between Mollett's future parole status and any of the mitigating circumstances submitted by Mollett to the jury. Majority Op. at 36. Mollett submitted the following fourteen mitigating circumstances to the jury:

1. Defendant loves and is thoughtful of his parents and his other relatives.
2. Defendant is helpful to his parents and other relatives.
3. Defendant is a hard worker.
4. Defendant is kind to animals.
5. Defendant loves people.
6. Defendant is a good big brother.
7. Defendant is compassionate to his family.
8. Defendant is gentle and caring to his sister's children.
9. Defendant has been helpful in apprehending a person who broke the law.
10. He is generous and kind to his friends.
11. Defendant has a family that loves and cares for him.
12. Defendant attempted to help a motorist hurt in an accident.
13. Defendant is industrious and has always been employed.
14. He struggled to succeed and graduate from high school despite attending school for the blind.

I fail to see how Mollett's parole status is even remotely relevant to the existence of any of these proposed mitigating factors.

In arguing that a *Simmons* violation occurred in this case because this court "cannot know the extent to which the prosecution's evidence and argument regarding Mr. Mollett's future dangerousness influenced the jury's conclusion that a particular mitigating

-22-

circumstance . . . did not outweigh the other aggravators," the majority improperly disconnects the rule announced in *Simmons* from the due process underpinnings Justice O'Connor set out as supporting the rule in her separate opinion. The reason that a defendant's future parole status is relevant at the imposition step of jury deliberations is because it is the most powerful evidence to rebut the prosecution's case that the defendant will constitute a future threat to society at large. *Simmons*, 512 U.S. at 177 (O'Connor, J., concurring in the judgment). That is, even if the defendant is utterly vile and lacking in compassion, it is unlikely that he will ever be a danger to society at large if there is no chance that he will be released from prison. Accordingly, evidence regarding future parole status is relevant and admissible under *Simmons* not because it has any power to rebut the prosecution's argument that the defendant is a vile and dangerous individual, but because it strongly rebuts any prosecution argument that the defendant will ever be able to bring his dangerous tendencies to bear on society at large. *Id.* Once again, it appears more likely the majority is announcing a limitless right to present the question of parole status to the jury in every case, rather than applying the rule set forth by the Supreme Court in *Simmons*. *See supra* note 4.

In sum, no *Simmons* violation occurred in this case. In addition, the due process violation that occurred during the eligibility step in deliberations is necessarily harmless

because the jury concluded Mollett was not a continuing threat to society.  Because the majority concludes to the contrary, I respectfully dissent.[12]

---

[12]In granting the writ, the district court also concluded that Mollett's counsel had provided constitutionally ineffective assistance.  Because the majority affirms the district court solely on the basis of *Simmons*, it would be waste of judicial resources for this dissent to proceed to the question whether Mollett is entitled to relief on the alternative ground of ineffective assistance.  Accordingly, like the majority, I offer no opinion on the propriety of the district court's conclusion that counsel was constitutionally ineffective.